UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MATERIALS, INC., | No. C 06-07372 MHP |
| Plaintiff, | **MEMORANDUM AND ORDER** |
| v. | **Re: Findings of Fact and Conclusions of Law on Inequitable Conduct; Partial Summary Judgment on Multimetrixs' Counterclaim; Multimetrixs' Counsels' Motion to Withdraw** |
| MULTIMETRIXS, LLC, | |
| Defendant. | |

United States Patent Number 6,831,287 (hereinafter the "'287 patent") claims a method for determining the correct position of a flat object using two sensors located at the edge of the object, one inside the edge of the object when placed in the correct position and one outside the edge. The '287 patent was issued to Boris Kesil, David Margulis, and Elik Gershenzon on December 14, 2004, and the assignee of the patent is defendant Multimetrixs, LLC (hereinafter "Multimetrixs").

Plaintiff Applied Materials, Inc. (hereinafter "Applied") brought this action against Multimetrixs, and among other allegations, asserted that two of its engineers—Allen Lau and Michael Feltsman—conceived the invention claimed in the '287 patent and were the actual inventors. Applied sought correction of inventorship of the '287 patent pursuant to 35 U.S.C. section 256. Multimetrixs asserted, among other counterclaims, that Applied was infringing the '287 patent.

In March 2008, the court conducted a four-day bench trial on the issue of inventorship of the '287 patent. During the bench trial on the inventorship issue, Applied elicited testimony from Boris Kesil, one of Multimetrixs' officers and a listed inventor of the '287 patent, that in the course of prosecuting the '287 patent, he caused Multimetrixs to submit forged documents to the United States Patent and Trademark Office ("PTO"). In light of this testimony, the court *sua sponte* raised the issue of inequitable conduct before the PTO. The court ordered the parties to brief the issue and oral argument was held on May 21, 2008. Pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 15(b), plaintiff was also deemed to have amended the pleadings to conform to the evidence presented at trial.

Now before the court are the parties' submissions and arguments concerning whether defendant Multimetrixs engaged in inequitable conduct before the PTO. Given a finding of inequitable conduct, the '287 patent is unenforceable and Multimetrixs' counterclaim against Applied for infringement of the '287 patent cannot be maintained. Therefore, pursuant to FRCP Rule 54(b), the court may enter partial summary judgment as to that claim. Having considered the written submissions and oral arguments of the parties and based on the evidence presented at trial, the court enters the following findings of fact and conclusions of law regarding inequitable conduct. Also before the court is Multimetrixs' counsels' motion to withdraw as counsel of record.

INEQUITABLE CONDUCT

I.      Findings of Fact

Applied is the leading developer of the systems and machines used to manufacture semiconductor wafers. Its "Endura" machine is used for physical vapor deposition processing, a method of depositing metals onto silicon wafers. During this process, a silicon wafer is held in place and temperature controlled by an electrostatic chuck while high purity metal material is deposited onto the wafer. When a silicon wafer is not present within the deposition process chamber, a shutter disk is used to cover the electrostatic chuck and protect it from waste deposition. The shutter disk is moved from the garage in which it is housed into the process chamber by way of a shutter disk assembly consisting of the shutter disk, a blade on which it rests, an arm which rotates into and out

of the garage, the garage, and a sensor system. The original Endura system used a single reflective sensor placed towards the center of the shutter disk to determine whether the shutter disk was in the garage. Because the sensor could only determine whether the shutter disk was in the garage and not the shutter disk's precise placement, misplaced disks were colliding with the electrostatic chuck resulting in breakage to the wafer and sometimes to the electrostatic chuck.

Allen Lau, one of Applied's engineers, was assigned to work on the problem starting in late 1999, but was unable to find a solution. Michael Feltsman, another Applied engineer, was assigned to work with Allan Lau on the Endura shutter disk assembly in February 2001. Through a social connection, Michael Rosenstein, a manager at Applied who was overseeing the Endura shutter disk assembly project, was introduced to Multimetrixs. Multimetrixs had experience in sensor technology and had a machine shop capable of producing a prototype of the new shutter garage that would be required for any new design. Rosenstein arranged a meeting between the Applied engineers Lau and Feltsman and the Multimetrixs personnel including Boris Kesil and David Margulis, two of the named inventors on the '287 patent. Following an initial meeting in March 2001, Applied and Multimetrixs corresponded about the shutter disk assembly.

Eventually, the problem of the misplaced shutter disk was solved by substituting the single reflective sensor placed at the center of the disk with two through-beam sensors placed at the edge of the disk. The two sensor design was an improvement over the previous single sensor design because it was able to detect the precise location of the shutter disk. When placed in the correct position, the edge of the shutter disk would be located just between the first sensor placed on the inside edge of the disk and the second sensor placed on the outside edge of the disk.

Multimetrixs and its inventors—Boris Kesil, David Margulis, and Elik Gershenzon—filed patent application number 09/976,890 on October 15, 2001. Based on this application, patent number '287 was granted on December 14, 2004. The '287 patent discloses the use of two sensors placed at the edge of an object in order to detect its position.

During the course of prosecution of the '287 patent, one of the Multimetrixs inventors, David Margulis, died. The date of his death, as shown on a death certificate, was October 10, 2002. Exh. 87.[1]  The remaining inventors, Boris Kesil and Elik Gershenzon were aware of Margulis' death.

3

1  CT 631:17–25, 595:23–596:1.[2] Prosecution of the '287 patent continued notwithstanding the death
2  of David Margulis. Boris Kesil was primarily responsible for corresponding with the PTO regarding
3  prosecution of the '287 patent. CT 628:2–13. His name is listed as the primary contact on most
4  filings, and he spoke directly with the patent examiner in an interview on October 28, 2003. Exh. 82
5  at 38, 47, 135.
6       On December 20, 2002, the PTO issued an office action regarding application number
7  09/976,890, the application upon which the '287 patent would eventually issue. Id. at 81–94. The
8  PTO rejected claims 1 through 20 and objected to claims 21 and 22. Id. On June 4, 2003, the
9  inventors responded to the PTO's objections. Id. at 95–120. In the response, what was originally
10  claim 20 in the application became claim 1, and two additional limitations were added. These
11  limitations referred to adjusting the placement of the two sensors to account for increases in the size
12  of the shutter disk as it accumulates waste deposition. Moreover, what was claim 21 in the original
13  application was cancelled, and what was originally claim 22 in the application became claim 2. Id.
14  at 102–104. Even though David Margulis had died the year before, the response was signed by all
15  three purported inventors—Boris Kesil, Elik Gershenzon, *and David Margulis*. Id. at 110. The two
16  claims as amended in the June 4, 2003 response were accepted by the PTO, Id. at 122–32, and those
17  claims were precisely the claims that eventually issued in the '287 patent.
18       After prosecution on the merits had closed, the PTO mailed on November 3, 2003 a notice of
19  allowance and fees due. Id. at 137. The notice informed the purported Mutlimetrixs inventors that
20  the issue and publication fees must be paid within three months from the mailing date of the notice
21  or the application would be regarded as abandoned. Id. The fee having not been paid in a timely
22  fashion, the PTO mailed on March 8, 2004 a notice of abandonment. Id. at 144-45. The two living
23  inventors, Boris Kesil and Elik Gershenzon, retained counsel, Ilya Zborovsky, to assist in
24  responding to the notice of abandonment. On July 23, 2004, the PTO received a package of
25  materials from Zborovsky including the required fees and a letter requesting that the patent
26  application be revived. Id. at 146–48.
27       The package of materials also included a combined declaration and power of attorney signed
28  by the two living inventors, Kesil and Gershenzon. The declaration and power of attorney asserted,

4

under oath, that Kesil and Gershenzon were the "original, first and joint inventors" of the '287 patent and it also authorized attorney Zborovsky to "accept and follow instructions" on their behalf. Id. at 157–59.

The PTO raised the question of why the combined declaration and power of attorney was signed by only two inventors, when the original application had three. The PTO queried,

> Paper #16 [the combined declaration and power of attorney] is a new declaration but on this declaration there are only 2 applicants listed. There were no papers located stating to delete the 3rd applicant 'Margulis.' Please advise on inventorship.

Id. at 169. In response to the PTO's directive to "Please advise on inventorship," a supplemental declaration was filed on November 16, 2004. Id. at 170-72. Pursuant to 37 C.F.R. section 1.67, the supplemental declaration purported "to correct any deficiencies or inaccuracies present in the earlier filed oath or declaration." By providing the signatures of all three inventors listed on the original application including Boris Kesil, Elik Gershenzon, *and David Margulis*, the supplemental declaration "corrected" the inaccuracy in the previously filed combined declaration and power of attorney, i.e. the assertion that Kesil and Gershenzon were the only two inventors. Having received the supplemental declaration, the PTO deemed the record to be "corrected," Id. at 169, and the patent issued on December 14, 2004 with all three inventors listed.

David Margulis, however, had died in 2002, and therefore could not have signed the supplemental declaration in 2004. Like the signature on the June 4, 2003 response to the PTO's objections to the patent claims, the signature on the November 16, 2004 response to the PTO's query regarding inventorship was a forgery.[3]

II.   Conclusions of Law

Inequitable conduct is a judicially created doctrine designed to prevent fraudulent conduct before the PTO. Those who participate in proceedings before the PTO, including purported inventors, have a duty to do so with the "highest degree of candor and good faith." Kingsland v. Dorsey, 338 U.S. 318, 319 (1949); see also 37 C.F.R. § 1.56. The doctrine was "borne out of a series of Supreme Court cases in which the Court refused to enforce patents whereby the patentees

5

had engaged in fraud in order to procure those patents." Digital Control, Inc. v. Charles Machine Works, 437 F.3d 1309, 1315 (Fed. Cir. 2006). As one court explained,

> No man should be granted a patent where his conduct has been such that any grant to him will be clouded with forgery and perjury or fraud practiced upon the Patent Office; and where it appears, at any stage of the proceedings, that an applicant has been guilty of conduct of this sort, he should be denied all further relief.

Mas v. Coca-Cola Co., 163 F.2d 505, 510 (4th Cir. 1947); see also Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 819 (1945) (recognizing "the public policy against the assertion and enforcement of patent claims infected with fraud and perjury").

A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution. Digital Control, 437 F.3d at 1313. The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence. Id. The court must then determine whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent, with a greater showing of one factor allowing a lesser showing of the other. Id. When, after a trial, the court has made factual findings as to materiality and deceptive intent, those factual findings are reviewed for clear error, and the decision of the ultimate issue of inequitable conduct is reviewed for abuse of discretion. Id.

The materiality of information withheld during prosecution may be judged by the "reasonable examiner" standard. McKesson Info. Solutions, Inc. v. Bridge Med., Inc., 487 F.3d 897, 913 (Fed. Cir. 2007). That is, materiality embraces any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent. Id. Information concealed from the PTO may be material even though it would not invalidate the patent. Id. However, withheld information that is merely cumulative to the information already considered by the examiner is not material for the purpose of inequitable conduct even if it would be considered material in isolation. Id.

In this case, there is no serious question as to the materiality of David Margulis' forged signatures. The first forged signature on the June 2003 response regarding the PTO's objections to the patent claims was material. The June 2003 response was a critical document containing

6

substantive amendments to the claims—amendments which were proposed to overcome the PTO's prior objections, which were eventually accepted by the PTO, and which ultimately became part of the issued claims. That David Margulis purported to sign the June 2003 response and purported to represent to the PTO that he invented the claims as amended are facts that a reasonable examiner would consider relevant and important.

The second forged signature on the November 2004 supplemental declaration filed in response to the PTO's query regarding inventorship was also material. It was submitted in direct response to questions by the PTO about Margulis' status as an inventor. The forgery on the supplemental declaration, filed pursuant to 37 C.F.R. section 1.67, was intended to resolve the PTO's concerns and correct any previous error regarding inventorship. The supplemental declaration accomplished what it was designed to do—it induced the PTO to believe that all three individuals were the actual inventors and it induced the PTO to issue the patent with all three inventors listed.

That the misrepresentations did not relate to patentability does not change the court's conclusion that the forged signatures are material. Digital Control, 437 F.3d at 1318 ("[u]nder the 'reasonable examiner' standard, a misstatement or omission may be material even if disclosure of that misstatement or omission would not have rendered the invention unpatentable"). Here, the misrepresentations concern inventorship, and while falsehoods regarding inventorship do not ordinarily affect patentability of the claimed subject matter, inventorship is nonetheless a critical requirement for obtaining a patent. An oath of inventorship is a prerequisite for a patent (see 35 U.S.C. § 115; 37 C.F.R. § 1.63(a)(4)) and examiners are required to reject applications on the basis of improper inventorship (see 35 U.S.C. § 102(f)). Accordingly, the Federal Circuit has found that "falsehoods and omissions . . . calculated to 'obfuscate the threshold issue of inventorship'" were material and supported a finding of inequitable conduct. Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1321–22. (Fed. Cir. 2000).

Moreover, the Federal Circuit has found that the submission of false affirmative affidavits, even if not related to critical issues such as patentability or inventorship, "may be determined to be 'inherently material.'" Digital Control, 437 F.3d at 1318. For example, in General Electro Music

7

1  Corp. v. Samick Music Corp., 19 F.3d 1405 (Fed. Cir. 1994), the applicant submitted in support of a
2  "petition to make special" (i.e. a petition to expedite processing by placing an application at the front
3  of the examination queue) a false affidavit claiming that he had conducted "a careful and thorough
4  search of the prior art." Id. at 1407–08. The Federal Circuit held "as a matter of law" that the false
5  affidavit was material because it succeeded in prompting the PTO to expedite consideration of the
6  application. Id. at 1411. Similarly, the Federal Circuit has stated that "there is no serious
7  question . . . as to the materiality" of a false representation of small entity status made for the
8  purpose of obtaining reduced maintenance fees. Ulead Systems, Inc. v. Lex Computer &
9  Management Corp., 351 F.3d 1139, 1146 (Fed. Cir. 2003) (vacating district court's grant of
10 summary judgment on the basis of inequitable conduct because genuine issues of material fact
11 remained as to *intent*). Such a misrepresentation did not induce issuance of the patent—indeed, the
12 misrepresentation was made years after the patent had issued. Id. at 1146, 1142. Nevertheless, it
13 induced the PTO to accept reduced maintenance fees and thus, contributed to the survival of the
14 patent. Id. at 1146.
15     In finding inequitable conduct on the basis of false affidavits, the Federal Circuit has
16 repeatedly commented that "[i]n contrast to cases where allegations of fraud are based on the
17 withholding of prior art, there is no room to argue that submission of false affidavits is not material."
18 Digital Control, 437 F.3d at 1318; Ulead Systems, 351 F.3d at 1146; Perseptive, 225 F.3d at 1322;
19 General Electro, 19 F.3d at 1411; Rohm & Haas v. Crystal Chemical Co., 722 F.2d 1556, 1571 (Fed.
20 Cir. 1983). Accordingly, whether the false affidavit concerns a procedural advantage such as
21 expediting the processing of an application (General Electro) or obtaining payment of a reduced
22 maintenance fee (Ulead Systems), or whether the false affidavit concerns a more central issue such
23 as inventorship (Perseptive), the false affidavit is material for purposes of inequitable conduct. In
24 this case, the wrongful conduct involved not only the submission of false, forged and perjured
25 affidavits on two different occasions, but the affidavits also made representations about the critical
26 threshold issue of inventorship.
27     Finally, it is irrelevant that the two surviving inventors could have pursued other valid
28 alternatives in dealing with the unfortunate death of the third inventor David Margulis. It is also

8

1  irrelevant that David Margulis' signature may not have been required because as claimed by
2  Multimetrixs, the inventors had assigned their rights to Multimetrixs.  In General Electro, the
3  patentee argued that rather than state that he had conducted "a careful and thorough search of the
4  prior art" in support of his petition to make special, he could have alternatively stated that he had
5  "good knowledge of the pertinent prior art."  General Electro, 19 F.3d at 1410.  The patentee argued
6  that because the latter statement would have been truthful, in contrast to the former statement which
7  a jury found to be false, the former statement therefore was not material for purposes of inequitable
8  conduct.  Id. at 1408, 1410.  The Federal Circuit rejected the patentee's argument, stating "[t]he
9  issue is not whether an alternative statement would have been truthful, but whether Maxwell's actual
10 statement that a prior art search was conducted was false."  Id. at 1410.

11         Likewise, in this case, the issue is not whether the surviving inventors could have
12 successfully prosecuted the patent without resort to forging the deceased inventor's signature.  The
13 availability of valid alternatives is not the issue.  The issue is whether what the surviving inventors
14 in fact chose to do was inequitable conduct.  David Margulis died in 2002 and his signatures on both
15 the 2003 and 2004 documents were forgeries.  The court concludes that there is clear and convincing
16 evidence of the submission of materially false information that a reasonable examiner would
17 substantially likely consider relevant and important.

18         Having found the forged signatures to be material, the court must next consider whether
19 there exists clear and convincing evidence of an intent to deceive.  The intent element of the offense
20 is generally proven by inferences drawn from facts, with the collection of inferences permitting a
21 confident judgment that deceit has occurred.  McKesson, 487 F.3d at 913.  A finding that particular
22 conduct amounts to "gross negligence" does not of itself justify an inference of intent to deceive; the
23 involved conduct, viewed in light of all the evidence, including evidence indicative of good faith,
24 must indicate sufficient culpability to require a finding of intent to deceive.  Id.

25         The submission of documents containing David Margulis' forged signature was not an
26 accident or an honest mistake.  Regardless of who in fact forged the signature, the surviving
27 inventors knew David Margulis was dead and they knew his signature was a fake.  They submitted
28 the signed documents hoping to deceive the PTO into believing that David Margulis was alive when

9

1 in fact he was not. The conduct and testimony of the surviving inventors during discovery and at
2 trial in this case provide a wealth of circumstantial evidence to establish that they knew what they
3 had done was deceptive and invented a story to maintain the deception.

5 In interrogatories, Applied asked Multimetrixs to identify any "statement or information . . .
6 in the . . . application that led to the '287 patent [that] is inaccurate or materially incomplete."
7 Although Multimetrixs purported to answer the interrogatory, it continued to hide the forgeries. See
8 Exh. 52 at 8 (interrogatory 8). Multimetrixs served, and Kesil verified under oath, a knowingly false
9 interrogatory response. Moreover, Multimetrixs avoided discovery related to the patent prosecution
10 attorney Zborovsky by claiming that he could not remember anything about the patent prosecution
11 because all of his files were lost in a fire. CT 635:16–18.

12 At their depositions, and again at trial, all three Multimetrixs witnesses—Mark Kesel, Boris
13 Kesil, and Elik Gershenzon—testified to the same incorrect date for Margulis' death. They each
14 testified that Margulis died sometime in late 2003 or 2004, after the first forged signature was
15 submitted to the PTO in June 2003 in response to the office action objecting to the patent claims.
16 CT 482:6–483:2; 595:23–596:1; 631:17–25. The court does not find this testimony credible. First,
17 Margulis' death certificate establishes that he died in October 2002. Second, it defies credulity that
18 all three witnesses would independently recall the same inaccurate dates for Margulis' death. Mark
19 Kesel went so far as to claim under oath that the certified death certificate from the County of Santa
20 Clara was wrong. CT 482:25–483:2. The only reasonable inference is that Kesil, Kesel, and
21 Gershenzon were deliberately trying to cover up the forgeries.

22 When confronted with the forged signatures on the witness stand, Kesil was at first evasive
23 and equivocal. In reviewing the signatures on the June 2003 response to the office action, Kesil
24 immediately recognized Gershenzon's signature, but then refused to confirm Margulis' signature.

25     Q. That's Mr. Gershenzon's signature?
    A. Yes.
26     Q: And he reviewed this?
    A. Yes.
27     Q: And that's Mr. Margulis' signature?
    A. Looks like.
28     Q. That's his signature, right?
    A. I'm not sure. But it looks all right.

10

```
1      Q.    You don't recognize his signature?
       Counsel:     Objection.
2      The Witness:  I cannot remember everybody's signature.
       Q.    So you're not sure if it's his signature?
3      A.    I'd have to check with others, okay.
       Q.    Please check. Let's compare it to page 38, there's another signature.
4      A.    Looks alike.
       Q.    So is that his signature, sir?
5      Counsel:     Objection, asked and answered; argumentative.
       The Court:   The objection is overruled, You may answer.
6      The Witness: Looks alike. But I cannot guarantee it. I'm not expert.
```

CT 629:23–631:4. When pressed about the forgery, Kesil initially lied, reverting to the story he and the other Multimetrixs witnesses gave during depositions that Margulis had died in late 2003, after the June 2003 response was submitted.

```
10     Q.    But Mr. Kesil, David Margulis was dead, wasn't he, at this time?
       A.    No, he pass away later than—he pass away not in June 12, 2003. He later pass.
11     Q.    You testified at your deposition that he died in late 2003, right?
       A.    Yes.
12     Q.    That's still your testimony to this court?
       A.    Yes. As I remember. But here June 12, 2003, [referring to Exh. 82 at 110, the
13           response to the office action which is in fact dated June 4, 2003].
```

CT 631:17–25. Kesil did not admit to the forgeries until presented with the irrefutable evidence of Margulis' certified death certificate.

```
16     Q.    Could we see Exhibit 87, [Margulis' death certificate]?
       . . .
17     The Witness:  Oh, 2002, he pass away.
       Q.    He passed away in 2002?
18     A.    Yes.
       Q.    He was dead when this was submitted, wasn't he, sir?
19     A.    Looks like.
       Q.    He couldn't have signed in response, could he?
20     A.    He cannot.
       Q.    And he couldn't have read the office action, correct?
21     A.    Sure not.
       Q.    And he couldn't have reviewed your response, correct?
22     A.    No.
       . . .
23     Q.    To get your patent application approved, sir, you forged Mr. Margulis's name, didn't
             you?
24     A.    But it's not my—yes, I admit—but not my hand, but I admit it forged.
```

CT 632:1–633:4.

The credibility of the Multimetrixs witnesses' and their testimony that David Margulis was alive in June 2003 is further undermined by additional evidence. Boris Kesil and Elik Gershenzon gave parallel, unequivocal deposition testimony that the two-sensor design claimed in the '287

11

patent was conceived while working with an individual named Todd Tomlison from a company called Sunx. When informed that Applied intended to call Todd Tomlison as a witness at trial, Kesil and Gershenzon both sought to retract their earlier deposition testimony, testifying at trial to a new, but again, parallel story that they may have gotten the name wrong, and perhaps due to clouded memory, it was someone other than Todd Tomlison. CT 566:13–577:9; 670:1–674:16. Mark Kesel's convictions for selling freon to methamphetamine dealers and for money laundering undermine his credibility. Kesel did not deny the government's allegations that in 1997 Kesel was involved in selling four times the amount of freon necessary to satisfy the methamphetamine needs of the entire California Bay Area for a year; that in 1998 and 1999 that same amount was sixteen times; and that in 2000, that amount was eleven times. CT 488:18–489:13. Elik Gershenzon claimed not to be proficient in English, testifying through an interpreter and failing to provide written direct testimony as ordered by the Court because of his limited language skills. But Gershenzon demonstrated during his examination that he could speak and understand English, responding to questions in English, responding to questions even before they were translated, and correcting the translations of the interpreter. CT 567:5–12; 570:22–571:1; 580:19–581:7; 591:20–21; 598:14–24. Moreover, Todd Tomlinson testified credibly that he has met with Gershenzon many times for extended periods, that Gershenzon speaks English very well, and that Gershenzon had a command of technical terms. Tomlinson also observed Gershenzon reading and writing English. CT 684:7–685:5. Given this evidence, the court does not find Multimetrixs' witnesses to be credible and does not credit their testimony that David Margulis died in late 2003 or 2004.

Other than ex post rationalization based on that fact that the surviving inventors could have pursued other valid alternatives, the defendant has offered no explanation for why David Margulis' signature appeared on documents submitted to the PTO in 2003 and again in 2004, when in fact he died in 2002. Even after the forgeries were revealed at trial, Multimetrixs and its witnesses offered no explanation or excuse for their conduct. Nor has Multimetrixs explained how its witnesses provided the same parallel but false testimony about the (incorrect) date of Margulis' death. Based on the evidence presented at trial, the court finds clear and convincing evidence that the surviving

12

1   inventors intentionally submitted documents to the PTO knowing that David Margulis was dead and
2   knowing that his signature was forged. The court concludes that the forged documents were
3   submitted with intent to deceive the PTO.

4   In sum, balancing the levels of materiality and intent, with a greater showing of one factor
5   allowing a lesser showing of the other, the court determines that the questioned conduct constitutes
6   inequitable conduct. Here, the showing of materiality and intent are both strong. The challenged
7   conduct involved not only an affirmative misstatement, but a misrepresentation about inventorship, a
8   core issue in patent law. There is also compelling evidence that the surviving inventors knew the
9   signature of the deceased inventor was forged, but submitted the forged documents nonetheless. The
10  conduct occurred not once, but twice. In this case, inequitable conduct has been shown by clear and
11  convincing evidence.

12  As a final matter, defendants argue that Applied sought to ambush Multimetrixs with its
13  inequitable conduct claim on the last day of the inventorship trial, despite the fact that Applied had
14  not pled a charge of inequitable conduct in its complaint. Multimetrixs' accusation that Applied
15  "surprised" it with an inequitable conduct claim is nonsensical because it was the *court* that raised
16  the issue and ordered further briefing. See Docket Entry 105, Minutes of Hearing on April 16, 2008.
17  Applied questioned Boris Kesil about the forgeries for credibility purposes on the inventorship issue.
18  The court then raised the issue of inequitable conduct *sua sponte*. The court gave both sides ample
19  opportunity to brief the issue and present oral arguments, and the court also deemed the pleadings to
20  have been amended to correspond to the evidence presented at trial. The court cannot ignore the
21  glaring evidence of both materiality and intent and set aside its finding of inequitable conduct simply
22  because of the unusual procedural circumstances in which the underlying facts came to light.

23

24  MOTION TO WITHDRAW AS DEFENSE COUNSEL

25  Under Civil Local Rule 11-5, "[c]ounsel shall not withdraw from an action until relieved by
26  order of the Court after reasonable advance written notice has been given to the client and all other
27  parties who have appeared in the case." Civil L.R. 11-5(a). At the close of the trial on inventorship,
28  Multimetrixs' counsel filed under seal a motion to withdraw as counsel of record. The court initially

13

denied the motion to withdraw given unresolved questions regarding the inequitable conduct issue. That issue having now been resolved, Multimetrixs' counsel renews their motion to withdraw.

In this district, the conduct of counsel, including withdrawal of counsel, is governed by the standards of professional conduct required of members of the State Bar of California. See Elan Transdermal Limited v. Cygnus Therapeutic Systems, 809 F.Supp. 1383, 1387 (N.D. Cal. 1992) (Orrick, J.); see also Civil L.R. 11-4(a)(1) (requiring attorneys practicing before this court to be familiar and comply with the standards of professional conduct required of members of the State Bar of California).  Pursuant to California Rule of Professional Conduct 3-700(C)(1)(c) and (d), an attorney may request permission to withdraw if the client insists that the attorney pursue a course of conduct that is illegal or that is prohibited under the rules of professional conduct, or if the client by his conduct renders it unreasonably difficult for the member to carry out the employment effectively.

California law imposes a duty of candor on all attorneys.  Bus. & Prof. Code § 6068; Rule of Professional Conduct 5-200(B).  "Counsel should not forget that they are officers of the court, and while it is their duty to protect and defend the interests of their clients, the obligation is equally imperative to aid the court in avoiding error and in determining the cause in accordance with justice and the established rules of practice."  Datig v. Dove Books, Inc., 73 Cal. App .4th 964, 980 (1999). Given the conduct of defendants during the course of trial, the court recognizes the existence of conflicts which may make it impossible or unreasonably difficult for defense counsel to continue representation.  Accordingly, the request of defense counsel to withdraw is GRANTED.

Defendant is admonished that, being a corporation, it may only appear in this court or before the court of appeals through counsel.  Any attempt to respond to or participate in further proceedings relating to this litigation before this court, and any appeal of this case will have to be through counsel and not *pro se*.

CONCLUSION

1  This memorandum and order constitute the court's findings of fact and conclusions of law.
2  To the extent the findings contain conclusions of law, they are deemed conclusions of law; to the
3  extent that the conclusions of law contain findings, they are deemed findings of fact.

4  Having found, following a bench trial, clear and convincing evidence of inequitable conduct
5  before the PTO, this court declares the '287 patent UNENFORCEABLE, and IT IS SO ORDERED.

6  IT IS FURTHER ORDERED that partial summary judgment as to Multimetrix's
7  counterclaim of infringement of the '287 patent is GRANTED and accordingly, that counterclaim is
8  DISMISSED.

9  Multimetrixs' counsels' motion to withdraw as counsel of record is GRANTED.  The court
10 retains jurisdiction over counsel and the firm for any further proceedings relating to the conduct of
11 this litigation.  The court further ORDERS that defendant Multimetrixs shall have thirty (30) days
12 from the date of this order and judgment to retain substitute counsel.  Pursuant to Civil Local Rule
13 11-5(b), because withdrawal of defense counsel is not accompanied by simultaneous appearance of
14 substitute counsel, leave to withdraw is subject to the condition that papers are to be served on
15 counsel for forwarding purposes, unless and until defendant appears by other counsel.

16 Applied has informed the court that it intends to file further motions, including a motion for
17 exceptional case under 35 U.S.C. section 285.  To allow Multimetrixs sufficient time to locate
18 substitute counsel, the court ORDERS that Applied shall not file any motions until thirty (30) days
19 after the date of this order.  Upon filing of Applied's motion, defendant shall have thirty (30) days to
20 respond, unless substitute counsel requests additional time to prepare an adequate response.  If
21 Multimetrixs fails to retain substitute counsel to respond to any motions filed by Applied, the court
22 shall enter default judgment against Multimetrixs.

24 IT IS SO ORDERED.

26 Dated: July 18, 2008

27                                    MARILYN HALL PATEL
                                       United States District Court Judge
28                                    Northern District of California

15

## ENDNOTES

1. All references to exhibits in this order refer to Applied's trial exhibits.

2. All references to "CT" in this order refer to the court trial transcript.

3. Although not at issue in this case, David Margulis' signature was also repeatedly forged in connection with the prosecution of another patent assigned to defendant Multimetrixs. See Docket Entry 106, Request for Judicial Notice, Exh. A, PTO file wrapper for U.S. Patent number 7,140,655 issued to inventors Boris Kesil, Elik Gershenzon, and David Margulis on November 28, 2006, at 42, 73, 85, 118, 138, 160.